```
                    UNITED STATES DISTRICT COURT

          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

          HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE



CARLY LEMMON, et al.,            )
                                 )
          Plaintiffs,            )
                                 )
          vs.                    )
                                 )   2:19-CV-4504-MWF
SNAP, INC.,                      )
                                 )
          Defendant.             )
_____)



               REPORTER'S TRANSCRIPT OF PROCEEDINGS

                    Los Angeles, California

                    Monday, October 28, 2019




            _____




                    AMY DIAZ, RPR, CRR, FCRR
                     Federal Official Reporter
                   350 West 1st Street, #4455
                      Los Angeles, CA 90012
```

*Please order court transcripts here:  www.amydiazfedreporter.com*

```
 1   APPEARANCES OF COUNSEL:

 2
     For the Plaintiffs:
 3

 4              BONDURANT MIXSON & ELMORE LLP
                By:  Naveen Ramachandrappa, Attorney at Law
 5              1201 West Peachtree NW, Suite 3900
                Atlanta, Georgia 30309
 6

 7

 8   For Defendant:

 9              MUNGER TOLLES & OLSON LLP
                By:  Jonathan Blavin, Attorney at Law
10                   John Major, Attorney at Law
                560 Mission Street, 27th Floor
11              San Francisco, California 94105

12
                MUNGER TOLLES & OLSON LLP
13              By:  Samuel Diaz, Attorney at Law
                350 South Grand Avenue, 50th Floor
14              Los Angeles, California 90071

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE CLERK:  Calling item number 3, case number
 2    CV-19-4504-MWF, Carly Lemmon, et al. vs. Snap, Inc.
 3              Counsel, please state your appearance for the
 4    record.
 5              MR. BLAVIN: Good morning, Your Honor.  Jonathan
 6    Blavin on behalf of Snap.
 7              MR. MAJOR: Good morning, Your Honor.  John Major on
 8    behalf of Snap.
 9              MR. DIAZ: Good morning, Your Honor.  Samuel Diaz on
10    behalf of Snap.
11              MR. RAMACHANDRAPPA: Naveen Ramachandrappa on behalf
12    of the plaintiffs.
13              THE COURT:  Good morning, counsel.
14              Let me say that regardless of how this case
15    ultimately comes out, how this motion ultimately comes out,
16    the sympathy that I have for the plaintiffs here who have
17    suffered just such a horrifying loss.
18              Turning to the matter at hand, let me hear from the
19    plaintiffs.  You know, the tentative isn't in the record, so
20    I'll just briefly say that the tentative is to grant it with
21    leave to amend.
22              You know, in particular, I thought the encouragement
23    theory just seemed to be a particularly close call.  It would
24    obviously be great on some of these issues if I could ask the
25    Wisconsin Supreme Court to drop everything that it's doing
```

1  and just give me a clear answer, but in the absence of being
2  able to do that, then I'll do the best I can.
3  　　　　All right.  Let me hear from the plaintiffs.
4  　　　　MR. RAMACHANDRAPPA:  Thank you, Your Honor.
5  　　　　I guess I'm going to start there with the question
6  of choice of law and conflicts of law.  I see here in the
7  tentative that it relies on the defendant's citation of
8  *Hernandez vs. Burger*, and distinguishes the cases that we
9  have cited, with particular emphasis on this language, "The
10 tortious conduct giving rise to the wrongful death action
11 occurs here," here being California.  And I think that that
12 same principle applies here because the tortious conduct
13 against Snap is their design of the speed filter which
14 occurred in California in this district.
15 　　　　And given the tentative ruling that we'll have leave
16 to amend, which we appreciate, and can help specify, there is
17 additional authority that we would recite in response to
18 *Hernandez*, including *Marsh vs. Burrell*, 805 F. Supp. 1493,
19 which is a Northern District of California case, which
20 distinguishes *Hernandez* and is similar to the facts that we
21 have alleged here, in that the plaintiffs were also citizens
22 of a foreign country, in that case Mexico, and the Northern
23 District of California held that *Hernandez* was an outlier.
24 And it also looked at the fact that in *Hernandez*, one of the
25 policies at issue was the idea that Mexico had a desire to

1   promote U.S. tourism in Baja, California. I'm not from this
2   region, but I understand that is the part that is in Mexico
3   itself. And they said that that specific policy was the
4   justification there, but we don't have that policy here.
5           So I'll start -- I wanted to put that there. I
6   realize that the tentative doesn't really materially rely on
7   any part of Wisconsin law versus California law, but it does
8   matter sort of going down the road, and also for issues of
9   certification. While you don't have the opportunity to ask
10  Wisconsin to decide this issue, I believe that the California
11  courts allow for certification from the Ninth Circuit.
12          THE COURT: That is correct, but not from the
13  District Court.
14          MR. RAMACHANDRAPPA: Correct.
15          But if you were to determine that Wisconsin law
16  applied, then it would sort of change that path down the
17  road. So I just wanted to flag those issues.
18          The next issue that I wanted to address is the
19  question of causation, and specifically, the issue of
20  encouragement liability. We have cited the case of *Weirum*
21  *vs. RKO Gen.,* which is a California Supreme Court case in
22  which the Court held that a radio station was liable under a
23  negligence theory that they were sort of promoting this go
24  catch the guy, I think he was called the Real Don Steele.
25          THE COURT: But there in that case, which is, you

know, definitely a well-known case, it was definitely the point. I think, to be analogous here, Snap would have had to have said, like, Oh, we are -- we are going to give goodies to the person who gets the most likes based on the highest speed, or something like that. It just -- the difference seems to be precisely the difference here, where there is this at least ostensibly neutral point about the use as the speedometer, as opposed to being for the purpose of having the -- as high a speed as possible.

MR. RAMACHANDRAPPA: I think that the first point to keep in mind is in *Weirum* itself, the defendant said, Look, we never told anyone to break the law. We assumed, and they in fact cited a legal principle, which is that you assume that others will act reasonably in compliance.

So number one, there is no -- the idea there is some kind of explicit versus implicit distinction in the law, it's not so black and white. And in fact, I would say that *Weirum* is an example of implicit. They are saying arrive here first, but no one is saying break the law in doing so.

Number two, the restatement second in Section 303 has a very useful comment, which says that, "The actor may not intend the third person to act in any particular way." So that is what we have here. "If so, the actor's negligence lies in the fact that he does or should realize that his conduct may cause the third person so to act." And we have

1   that here.

2           Now, I understand that Snap doesn't have anything
3   that tells you literally drive 100 miles per hour, but they
4   know that. They know that that is what is happening to
5   people.

6           And in particular, we have cited this article, which
7   is only for the sort of point of demonstrating the
8   reasonableness of the inference. "Looking at the speedometer
9   in your car isn't as much fun as capturing the car
10  accelerating on a camera and then sharing with your friends."

11          And to me, it is important that you see the number
12  over and over, it's always 100 miles per hour or more in
13  these incidents. It's not like that they are just going
14  faster than the speed limit. There is something about that
15  connection.

16          Now, maybe the first time Snap didn't know about it
17  and so you can say in that instance they weren't doing
18  anything to encourage it. Maybe after the second time, maybe
19  after the third time. But when it happens over and over and
20  over, as the restatement says, they may not have intended for
21  that to be the case, but when they know that they are
22  creating this stimulus, which is the speed filter, and that
23  that is the specific basis for the lawsuit, that is why the
24  encouragement theory is viable here, despite the fact that
25  it's not explicit.

1          And if the tentative goes forward, we will certainly
2    amend to make that clear, but at least in terms of the
3    reasoning and arguments, I think it would be shortsighted to
4    think that we are just going to ignore how these tools are
5    actually used, rather than how we believe everyone should
6    act.
7          The last issue that I want to discuss from the
8    tentative is the Communications Decency Act.  Starting with
9    the *Dyroff* case, which was a case that is cited in the reply
10   brief, and we didn't have an opportunity to address it in
11   that sense, the key point in the *Dyroff* case is that the
12   plaintiff decedent there, the young man who died from a
13   fentanyl overdose, he posted a message that said, I'm looking
14   to score heroin.  The drug dealer responded and said
15   something to the extent of, I've got it, and then they met up
16   that way.
17         The key reason why the Communications Decency Act
18   applies there is that is the content of what is posted that
19   is the driving force for the claim.  If no one ever responds,
20   I've got the drugs, or the person says in the post, I want
21   drugs, if those things don't happen, there is no claim.
22   Here, it has nothing to do with what you say in the post; and
23   in fact, it doesn't matter if you post it at all, it's the
24   speed filter itself that causes the action and is the basis
25   for our tort claim.

1    Now, I understand that that is a part of their
2    publishing platform, the speed filter, but the important part
3    is that it's their content, they created the speed filter,
4    it's not a blank box, and that is the basis for the claim,
5    it's that it causes those actions.  It doesn't matter what
6    ends up getting posted.
7    And so it's the -- it's almost like a reverse
8    situation.  You've got a situation where the post is the
9    culmination, it's like the confirmation of a tortious act,
10   but the tortious act is encouraging someone to speed.  That
11   is what the Georgia Court of Appeals held in *Maynard vs.*
12   *Snapchat*, of which I was the counsel in that case, as well.
13   And the Court said we are going to distinguish the *Barnes*
14   case, the *Fields* case where it's, you know, Hamas or ISIS
15   content, it depends on what they actually say.  Here, it
16   doesn't depend on that in any way, it's the speed filter
17   itself.
18   One final point related to this Communications
19   Decency Act issue, I see in the tentative that there is this
20   language about explaining further how the defendant has
21   materially contributed to the content.  I just want to make
22   an analytical point about the framework of the CDA.  If it's
23   the defendant's speech and content, and the tort claim is
24   based on that alone, then there is no question about
25   neutrality or material contribution.  It's only when it's a

1   user's content, and then the defendant does something, and
2   the plaintiff alleges that that thing that you did is what is
3   contributing to it, then you've got to prove that it's not a
4   neutral tool and that it's enhancing, it's causing something
5   to add it.
6           And the *Fair Housing Act* case draws out that
7   distinction.  It says first -- in that instance, the Fair
8   Housing counsel claims that just asking questions of
9   prospective tenants that are illegal, if the mere act of
10  asking questions, that itself is not covered by the CDA.
11          And then second, they go to these drop-down boxes
12  where they solicit various questions.  That is when they look
13  at whether there is some kind of substantial contribution to
14  the illegal activity and they look to this material
15  contribution.
16          So with respect to that issue, I think if the Court
17  agrees with us, and we think it should, that it's the speech
18  filter itself that is the basis of the tort claim, then there
19  is no question as to whether it materially contributes or
20  not, it is their conduct.  Now, we may have a separate
21  question as to whether the speed filter is causing that
22  activity, but that is a tort claim issue.  That is the
23  previous issue we are talking about.
24          THE COURT:  I have a better understanding now of the
25  distinction that you are drawing.

1            Let me hear from Snap.
2            MR. RAMACHANDRAPPA: Thank you.
3            MR. BLAVIN: Thank you, Your Honor.
4            I just want to note at the outside, as well, that
5    Snap does have the deepest sympathies for the plaintiffs in
6    this case, and this was a tragic accident. So I just wanted
7    to share that on the record.
8            With respect to the legal arguments that are -- that
9    plaintiffs' counsel made, I'll start by just briefly touching
10   on the choice of law issue.
11           I think, as plaintiffs' counsel rightly noted, for
12   purposes of the Court's analysis, it doesn't seem to make a
13   material difference whether or not Wisconsin or California
14   law would apply, but I would note that when you look at the
15   authorities, what the Courts repeatedly have held, including
16   in the context of wrongful death cases caused by accidents,
17   defects relating to manufacturers, the tortious conduct,
18   which is the accident here, the use of the Snap was in
19   Wisconsin. And that is what the *Hernandez* case held from the
20   California Court of Appeal. The *Mazza* decision from the
21   Ninth Circuit makes that repeatedly clear.
22           And just briefly to note that Wisconsin does have a
23   strong interest in having its own law apply here. If you
24   look at the *Brunette* decision from the Wisconsin court, what
25   the Court of Appeal noted was, Wisconsin has a strong

1   interest in deterring dangerous conduct, risky behavior on
2   its own streets which could lead to not only harm to the
3   plaintiffs in those cases but to other bystanders,
4   third-parties.  And that dealt with the issue of comparative
5   fault, which I understand Your Honor didn't reach in this
6   tentative order, but it does demonstrate why Wisconsin does
7   have a compelling interest in having its own law apply here.
8           With respect to causation, the principal issue that
9   plaintiffs' counsel focused on was the encouragement test,
10  which Your Honor noted is distinguishable here, the *Weirum*
11  decision, because there it was an explicit competition.
12          Now, although the defendant may not have said, And
13  you should break the speed limit, it was a game.  It was, Be
14  the first to get to this location and you will get a prize.
15  And there are no allegations here, nor frankly can there be,
16  and I think plaintiffs' counsel essentially admitted that on
17  the record, that Snap at all rewards in any way going high
18  speeds using the speed filter, nor does Snap even reward, or
19  there are any allegations in the Complaint that it rewards
20  use of the speed filter at all.
21           I think that is a critical distinction between the
22  *Weirum* decision and this case.  At best what they have
23  alleged is the use of social media apps are generally
24  addictive, compulsive, people want to use them in a way which
25  they claim has sort of unknown and variable effects on users.

1           And I think, as Your Honor rightly noted in the
2   tentative, those allegations are insufficient to support an
3   encouragement theory.  We would also say that they are
4   insufficient under *Iqbal* and *Twombly*.  They are incredibly
5   vague and speculative, and there is nothing demonstrating
6   that Snap itself creates any kind of game, says go faster,
7   speed up.  And in fact, as Your Honor noted in granting the
8   request for judicial notice, Snap explicitly tells users not
9   to Snap and drive in multiple places in the app and in the
10  terms of service.
11          Briefly with respect to this question of stimulus
12  and foreseeability, I think what plaintiffs' counsel are
13  essentially arguing is Snap, based upon some of the
14  materials, much of which were outside the record, that Snap
15  knows that some accidents are occurring.
16          As we note in our papers, the issue of
17  foreseeability is distinct from causation.  In similar cases,
18  such as the *Modisette* case from the California Court of
19  Appeal, the *Coalition Against Distracted Driving* case from
20  the California Court of appeal, and in other decisions, the
21  Courts have acknowledged that there may be some
22  foreseeability that accidents do occur, but that doesn't mean
23  there is a causal link between the use of the app or the
24  device and the actual accident itself.
25          In fact, in the *Modisette* case, there they had

1　alleged that Apple had applied for a patent because it was
2　aware of the possibility of accidents from people's use.  For
3　example, the FaceTime app while driving, the Court said that
4　may be so, and it may have been foreseeable to Apple, but
5　it's not enough to establish proximate causation as a matter
6　of law.  All of those cases were decided on the pleadings.

7　　　　Briefly on the stimulus point, if you look at the
8　*Modisette* and *Meador* case from the Fifth Circuit, in those
9　cases there were similar allegations that these types of apps
10　and features were compulsive, that people wanted to use them,
11　and specifically young adults felt the need to continuously
12　use them.  What the Court said is that is just not sufficient
13　to establish causation as a matter of law.  We think that
14　same principle holds here.

15　　　　Finally, with respect to this issue of whether or
16　not this could be something that could be certified to the
17　Court, the only thing I would note on that is when Federal
18　Courts have looked at similar issues, they have exercised
19　restraint in this space, because they are courts sitting in
20　diversity.  And to the extent this is a novel question, like
21　Your Honor said, you know, maybe the Wisconsin Supreme Court
22　would have something to say about this.  They have exercised
23　restraint.

24　　　　The Fifth Circuit in the *Meador* case specifically
25　noted as a court sitting in diversity under *Erie*, we should

1  not expand state law in a way which is not clear.  Judge
2  Cohen, the *Anthem* privacy litigation case from the Northern
3  District said something different where Indiana law there had
4  not specifically addressed the issue, the Court was going to
5  take the more conservative route and not find a violation of
6  state law.
7          THE COURT:  Well, I understand your arguments.  I'll
8  take it under submission.  If I grant this with leave to
9  amend, I guess I think then the final order in some ways will
10 be as tentative as this in the sense of what I would really
11 like to do is give the plaintiffs the chance to just put
12 their best foot forward and then really grapple with these
13 difficult issues, which in the digital age are going to
14 become more and more common and more and more important.
15         So I guess regardless of whether the final order is
16 consistent with the tentative or not, even if it is, it
17 doesn't mean that we aren't going to have to be having this
18 discussion the next time around.
19         MR. BLAVIN: Understood, Your Honor.
20         If I could make one point briefly on the
21 Communications Decency Act?
22         THE COURT:  Yes.
23         MR. BLAVIN: The plaintiffs noted that, Well, this,
24 you know, the issue is whether or not the neutrality only
25 applies if you are dealing with a tool that is meant to

1  facilitate communications, if it's a publishing function.
2            And what we would submit, and I think Your Honor
3  agrees with it, is that the speed filter is a tool that
4  allows people to take their own inputs, their speed, and
5  create a Snap and share it.  That is a publication tool.
6  It's no different than, for example, in the *Marshall*
7  *Locksmith* case from the DC Circuit, there the question was
8  Google had created a mapping functionality, such that people
9  could put in their address and it would show a visual
10 demonstration of the map.  The Court said that is a neutral
11 tool.  It is a publication tool, but it's neutral.
12           And I think what the facts here as alleged, and as,
13 in fact, our reality will show, is this is a completely
14 neutral tool.  There is nothing within the tool that tells
15 people to speed up, to go faster, to break the law.  We agree
16 with Your Honor that that would be a much tougher case if
17 that was it.  If Snap had created its own content telling
18 people to speed up, or if flames showed up when someone was
19 going 100 miles per hour, or something like that, that would
20 be a different case.
21           THE COURT:  Well, to the extent that I am persuaded
22 by that, and this was implicit in the plaintiffs' brief, I
23 think it's fair to say, is that while that might help you on
24 that claim, the very fact that the whole purpose is to be
25 able to communicate this then to others and why, you know,

1    nobody -- is it really plausible that somebody wants to
2    communicate that they are going 15 miles an hour? You know,
3    it's part of the gestalt, which makes it difficult in regard
4    to the first claim for relief.
5           MR. BLAVIN: Understood, Your Honor.
6           But I would briefly note that there are many ways
7    that someone can show themselves going at a high speed that
8    are safe and not illegal, such as being on a plane, the
9    filter would work in that context, such as being on a train,
10   sometimes people also just want to show like they are on a
11   Ferris wheel how fast they are going in that context.  There
12   are a number of safe and legal uses of the filter.  The
13   question is, does the filter itself compel a dangerous or
14   unlawful use?  And we would say that based upon the
15   allegations, it is completely neutral in its operation.
16          THE COURT:  Well, if I maintain the view here, and
17   if we are -- we come back and the plaintiffs have put their
18   best foot forward, then one of the issues will simply be is
19   the argument that you are making a legal issue or a factual
20   issue?  So that would obviously be a point that would have to
21   be addressed.  But I want to address that, as I said, when
22   the plaintiffs have put their best foot forward.
23          Thank you, counsel.  The matter is taken under
24   submission.
25          MR. BLAVIN: Thank you, Your Honor.

1        MR. RAMACHANDRAPPA: Thank you, Your Honor.
2                  *****     *****     *****
3    I certify that the foregoing is a correct transcript from the
4    record of proceedings in the above-titled matter.
5
6
7
8    ---------------------------
9
10   Amy C. Diaz, RPR, CRR              November 26, 2019
11   S/  Amy Diaz