1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   HONORABLE ANDREW J. GUILFORD, JUDGE PRESIDING

4   CARLY LEMMON, ET AL.,            )
                                     )
5                                    )
                                     )
6                    Plaintiffs,     )
                                     )
7                                    )
                                     )
8          Vs.                       )   No. CV19-4504-MWF
                                     )
9                                    )
                                     )
10  SNAP, INC.,                      )
                                     )
11                                   )
                                     )
12                   Defendant.      )
                                     )
13  _____ )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                  *Motion Hearing*

18             LOS ANGELES, CALIFORNIA

19           MONDAY, FEBRUARY 10, 2020

20

21

22          MIRIAM V. BAIRD, CSR 11893, CCRA
          OFFICIAL U.S. DISTRICT COURT REPORTER
23         411 WEST FOURTH STREET, SUITE 1-053
               SANTA ANA, CALIFORNIA 92701
24                  MVB11893@aol.com

25

1                          **A P P E A R A N C E S**

2

3    **IN BEHALF OF THE PLAINTIFF,**        BONDURANT MIXSON AND
     **CARLY LEMMON, ET AL:**               ELMORE, LLP
4                                            NAVEEN RAMACHANDRAPPA
                                             1201 WEST PEACHTREE NW
5                                            SUITE 3900
                                             ATLANTA, GA 30309
6

7

8

9    **IN BEHALF OF THE DEFENDANT,**        MUNGER TOLLES & OLSON, LLP
     **SNAP, INC.,:**                       BY:   JOHN B. MAJOR
10                                                 JONATHAN H. BLAVIN
                                             350 SOUTH GRAND AVENUE
11                                           50TH FLOOR
                                             LOS ANGELES, CALIFORNIA
12                                           90071

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1         LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 10, 2020; 1011

2                              ---

3

4         THE CLERK:  Calling CV19-4504-MWF, Carly Lemmon, et

5    al vs. Snap, Inc.

6         Counsel, please rise and state your appearance for

7    the record.

8         MR. RAMACHANDRAPPA:  On behalf of plaintiffs,

9    Naveen Ramanchandrappa.

10        THE COURT:  Good morning.

11        MR. BLAVIN:  Good morning, Your Honor.

12        Jonathan Blavin on wave of defendants snap.

13        MR. MAJOR:  Good morning, Your Honor.

14        Jonathan Major on behalf of defendants.

15        THE COURT:  I want to start off by saying I don't

16   feel as prepared for this hearing as I would have liked to

17   have been.  I -- for reasons utterly beyond my control, I

18   just had no ability this weekend to or even really last week

19   to prepare for it.  Last night, I re-read my prior order, and

20   this morning, I read a bench memo or skimmed a bench memo

21   that one of my law clerks had prepared.  I skimmed your

22   briefs.  I did re-read closely my prior order.  From that, I

23   had the thoughts and the questions that I've provided in the

24   tentative.  I assure you that I will read your briefs closely

25   before I issue my final order, as well as re-read Dyroff and
```

1   any other case law that seems determinative.

2          To even summarize the tentative even more simply, I

3   don't know right now that I have to decide between the

4   question of which choice of law.  I think -- I don't know

5   that there is that big a difference, you know.  I mean, it's

6   kind -- in a sense Georgia law is the law that looks like is

7   really mattering now on whether I would go along with that.

8   And so I can continue as to that to kick the can down the

9   road.  Obviously, I might very well be wrong about that.

10  Each of you has the right to -- or to argue that you -- that

11  it's a determinative issue that it should be decided as a

12  matter of law right now.  I'm just sharing with you that is

13  not the way it seems to me.

14         The other thing is to put it in an even more very

15  basic issue here as to what it is, you know, whether it's in

16  terms of -- you know, foreseeability just because I did --

17  last time I did it as a specific legal issue on a -- I did it

18  related to an issue which really is a legal issue, not a

19  factual issue.  That's duty.  I did it on the basis of the

20  arguments that were presented at the time.  On the basis on

21  the complaint as it existed at the time.  I don't know that

22  ruling is necessarily all that indicative of -- to what

23  degree foreseeability is a part of whatever ruling ultimately

24  gets made on proximate cause.

25         I don't think either party is necessarily being

1    inconsistent of making certain arguments in that regard.

2    Obviously, apart from that, I don't intend to go back and

3    revisit a ruling that I previously made.  But, you know,

4    ultimately, here, what the parties are arguing about is in a

5    certain sense of like what is it that the law expects?  What

6    is it that society expects as a reasonable limitation on

7    liability in the wake of individual cases that are as

8    horrible as here.  Again, as I said last time, let me say how

9    much my heart goes out to the parents here, but having said

10   that and feeling that way, I, nonetheless, have to do

11   whatever the -- it is that the law requires me to do.  Should

12   it ever get there, of course, the jurors will face the same

13   grim responsibility as that.

14         In that sense, I am kind of looking at the statute

15   because if I'm going to have to sort of be drawing some line,

16   wouldn't it make more sense -- I would certainly feel more

17   comfortable as a judge and not a legislature to enforce the

18   line that Congress has seen fit to draw one way or the other.

19   I mean, by saying that, it's not really indicative of

20   anything for either side.  It's just a fact.

21         Nonetheless, just because of Modisette, there's

22   some basis for saying that there are cases, albeit somewhat

23   outliers under either Wisconsin or California law, where just

24   because of the nature of the facts and the logic of the

25   situation, as a matter of law, one could say that there is

1   not proximate cause while obviously recognizing that that

2   generally is meant to be an issue of fact for the jury.  Of

3   course, that is something that is in the favor of the

4   plaintiffs.

5        So I hope that the tentative and these general

6   thoughts will be helpful to you as you do your best to

7   address the issues here.  I just want to say, again, to the

8   extent that I've missed something, misunderstood something,

9   that I'm -- the question is just presuming something which is

10  obvious from your briefs, and I can't catch it, you have the

11  chance to point it out to me.  Don't worry that you are going

12  to hurt my feelings.  I will grateful to you if you do that.

13  I will certainly be quite familiar with your briefs before I

14  issue a final order in this case.

15       With that, let's start off with the defense as the

16  moving party.  Let's start with the statute.  I'll hear from

17  the plaintiff.  I'll give the defense a chance to respond.

18  After that, we'll deal with the proximate cause.

19       Counsel.

20       MR. BLAVIN:  Thank you, Your Honor.  Your Honor, I

21  intend to go through the questions, but obviously provide

22  some broader overlay with respect to the issues presented

23  into this case.  Before I hop into the substantive arguments,

24  I want to express Snap's sympathies toward the families here.

25  This was a horrible tragic accident.  They have our deepest

1      sympathies.

2           Starting with the Communications Decency Act.  As

3      Your Honor is aware, the CDA generally provides website and

4      online services like Snap with immunity for any claims that

5      arise from the sharing, posting of third-party content.  One

6      of the questions that Your Honor posed at the beginning of

7      the tentative is whether there's any case law that addresses

8      the situation where the content in and of itself may not be

9      unlawful, but the claims are really still directed at the

10     website's functionality in terms of sharing information,

11     allowing people to connect and communicate with one another.

12          Yes, Your Honor, there are decisions which directly

13     address that issue.  The case with collective authorities on

14     this point is the Doe II versus MySpace, Inc., case.  It's at

15     175 Cal. App. 4th 561.  We cited it in our opening motion on

16     page 25, footnote 11.  It's discussed in our reply brief on

17     page 23.

18          In that case, the allegation was that MySpace

19     essentially had facilitated communications between assailants

20     and the plaintiff in that case who ended up connecting

21     offline with the assailants and was harmed.  She sued MySpace

22     and said, you know, you facilitated this.  You allowed this

23     to occur.  I was injured as a result of this.  One of the

24     arguments that the plaintiff made there as to why the CDA

25     would not apply is she said I'm not challenging any of the

 1    content in and of itself.  The communications themselves were

 2    not illegal.  I'm not saying they're illegal.  There was

 3    nothing tortious in the content itself that was posted on the

 4    website.  Therefore, the CDA should not apply.

 5          What the California Court of Appeal said in

 6    rejecting that argument is it noted that Courts have

 7    rejected, quote, a false distinction between tortious

 8    information and harmless communications.  The Court went on

 9    to hold the CDA applies even where the alleged harm, quote,

10    actually resulted from conduct that occurred outside of the

11    information exchanged and occurred offline.

12          So Courts have wrestled with this question before

13    of well, if I just look at the contents, it may not be

14    illegal.  But are you really challenging the website's

15    functionality as a publisher of third-party content?  If

16    that's where the claims are targeted, if that's what they're

17    focussed on, then the CDA applies here.

18          We would submit, Your Honor, that is really

19    precisely the case here.  The claims in this case challenge

20    the filter's functionality in terms of it allowing to take

21    third-party information, someone's speed, and share that with

22    other parties.  All of the allegations focused upon the --

23    the individuals here wanting to purportedly speed.  All of

24    that was focused on the fact that they can share that

25    information with others.

1        So we would submit that the functionality challenge

2    is exactly what the CDA is meant to protect.  That is people

3    providing motion and sharing it with third parties.  That's

4    the functionality which is targeted here.  That is no

5    different than the litany of cases which have addressed

6    similar circumstances.  Whether the content in and of itself

7    may be illegal is not relevant to that question.  You look at

8    what the claims are challenging.

9        Another question that Your Honor posed is, does the

10   immunity apply if the website's features are not alleging

11   encouraging users to post unlawful content, but rather are

12   encouraging users to engage in unlawful conduct, which then

13   effectively results in potentially lawful content.  The

14   answer to that, Your Honor, is also yes.  Courts have looked

15   at whether the website is encouraging various activity which

16   may occur offline but result in the posting of content.

17       So the example that I would give would be the Park

18   La Brea versus AirBnB case.  It's cited in our opening motion

19   at page 23, La Park La Brea versus Airbnb 285 F.Supp. 3d 1097

20   from this district, Judge Gee from 2017.  There, the

21   plaintiff was a large real estate owner.  The main building's

22   landlord of many tenants.  The allegations were that Airbnb

23   had created a website which was essentially incentivizing its

24   tenants to post listings and to do so, therefore, would

25   breach their sublet agreements with the landlord.  The

1    allegations was not simply that Airbnb was allowing people to

2    post the website, but, in fact, the entire design of the

3    Airbnb website, the ecosystem that it had created was sort of

4    incentivizing people, because Airbnb is what it is, to engage

5    in the unlawful online conduct of breaching their lease

6    agreements by subletting it.  That was the focus of what was

7    illegal.  The breach of the sublet agreements.  The claim was

8    Airbnb is engaged in tortious interference with those sublet

9    agreements.

10         What Judge Gee said is yes, your allegation is that

11   it is causing people to engage in conduct that occurs offline

12   that results in a breach of a lease agreement, but what

13   you're still ultimately targeting is the functionality of the

14   Airbnb website in this case.  That it has made it easy for

15   people to post listings and provide various tools neutral in

16   nature that allow them to engage in those listings.  She said

17   that the CDA barred their claims at the motion to dismiss

18   stage and dismissed the case with prejudice.

19         Other cases have held the same thing.  If you look,

20   for example, at the Daniel versus Armslist decision from the

21   Wisconsin Supreme Court in 2019, there the plaintiffs were

22   challenging a website which facilitated the sales of guns.

23   People could post listings to sell guns illegally.  The

24   allegations there, similar to here, were that the

25   facilitation and encouragement of illegal firearm sales by

1    third parties was conducted by the website just because of

2    how the website was designed.  Again, that is conduct which

3    ultimately was occurring offline.  People meeting up with

4    each other and selling guns which were illegal, but

5    nonetheless, the functionality that was targeted by the

6    claims like here simply related to the fact that people could

7    post content, share content, and communicate with each other.

8           Similar to that Jane Doe versus Backpage case from

9    the First Circuit 2016 involved allegations that the website

10   was designed effectively to facilitate sex trafficking.

11   Again, this all offline conduct, the facilitation of sex

12   trafficking, the Court -- First Circuit there looked at the

13   claims, what they were challenging, and they simply related

14   to the neutral functionality of the website that allowed

15   people to communicate with one another.  There the claims,

16   frankly, went much further than they do here in terms of

17   allegations of encouragement.  There, the plaintiffs alleged

18   that Backpage had effectively designed its entire website to

19   allow this illegal conduct to occur.  It had allowed people

20   to communicate anonymously with one another.  Various

21   elements of not being able to track payments to one another.

22   They were saying this is effectively enabling sex trafficking

23   and making it difficult to highlight it.

24          The First Circuit said, if you look at everything

25   that is challenged, it's still neutral functionality.  Still

1   challenging features that allow people to communicate and

2   share information.  The CDA applies, notwithstanding the fact

3   that the conduct alleged there was obviously horrific.  And

4   ultimately, what happened -- Your Honor may be aware of it --

5   the Congress intervened said we're going to create a

6   carve-out under the CDA for this type of activity.  That was

7   the passage of FOSTA and SESTA, which essentially said these

8   types of sex trafficking claims could not be subject to CDA.

9   Obviously, there is no carve-out in this case for the conduct

10  alleged here.

11          Jumping to the last paragraph of Your Honor's

12  questions with respect to the Communications Decency Act,

13  Your Honor asked what is the best argument that the speed

14  filter is a content neutral tool that merely helps facilitate

15  user-to-user communications?  What we would argue and submit,

16  Your Honor, is that the tools simply take third-party

17  information, someone's speed, and allows that person to

18  create and share a snap with one another.  It does so in a

19  way which is neutral.  It works at two miles an hour,

20  20 miles per hour, or 300 miles per hour.  Someone could be

21  on a plane and use it.  That's often what users do with it.

22  Someone can be on a train and share it.  The tool itself is

23  neutral.  There is no allegation that anything within the

24  tool encourages people to speed, rewards people for speeding,

25  none of that exists.  This is no different than other tools

1    which takes third-party information, allow people to post it,

2    and share it.

3         For example, in the Marshall Locksmith case from

4    the D.C. Circuit, the allegation there was Google is taking

5    people's address, their third-party information, and through

6    its algorithms creating a map to pinpoint that address and

7    allow people to locate that information.  What the plaintiffs

8    argued is that goes too far.  That is just taking not just

9    posting someone's address, but taking that information and

10   presenting it in a new way.  The D.C. Circuit said no.  All

11   that is doing is it is taking third-party content, someone's

12   address, putting it through its neutral algorithms in a way

13   to visually display it, and the CDA would apply and bar those

14   claims.

15        No different here.  That is exactly what the speed

16   filter is doing.  It is taking someone's speed, presenting in

17   a certain way, the user then decides to share their

18   information, their speed with others.  There's also

19   temperature filters, altitude filters, all of these are

20   taking information and allowing people to share it with

21   others.  In the Herrick case from the Second Circuit, the

22   Court also considered arguments relating to geo location

23   functionality.

24        THE COURT:  Let me ask you this -- I know -- I

25   don't want us to completely get into negligence then, because

1    I'd like to hear the response of the plaintiffs on the

2    statute, but I know when I -- noted certain issues last time

3    and invited the plaintiffs to put their best foot forward,

4    how do you feel that the changes in the complaint have an

5    effect, if any, on the statutory arguments, you know,

6    clearly, I realize that they assert that they have on the

7    negligence arguments and, of course, you're disputing that.

8    Is there anything about the -- now that you're talking about

9    the functionality and all of that, is there anything that you

10   feel is presumably from your point of view deficient about

11   those amendments?  Is there anything to the extent that we

12   addressed some of these issues last time and were thinking

13   about them that anything has changed or not changed since we

14   got the new complaint?

15           MR. BLAVIN:  Your Honor, we don't think anything

16   has changed.  There is no new allegations in the complaint

17   relating to the functionality and operation of the filter

18   itself.  That is the critical point of analysis certainly for

19   the CDA.  We would also submit for the negligence claim and

20   the question of approximate causation.  On the CDA, there's

21   no new allegations relating to how it functions and operates.

22   If anything, the new allegations further confirm that the

23   tool is neutral.

24           For example, Your Honor, they quote and cite to

25   various articles.  If you look at those articles, which are

1    attached to our request for judicial notice, they're

2    incorporated into the complaint themselves, the articles

3    note, for example, that the functionality of the -- the

4    filter allows people -- this is Exhibit C to my declaration

5    submitted in the request for judicial notice -- that can be

6    used on a bike, on a train, or while simply walking.  That

7    again confirms that the filter operates in a neutral fashion

8    in many safe and innocent contexts.

9           Exhibit A to the Blavin declaration further

10   notes -- this is quoting from the article -- that the filter

11   can be used in innocent ways.  So these articles simply

12   confirm that the filter can be used by users in numerous safe

13   ways, and unfortunately, in a limited subset of cases, people

14   misuse the filter in improper ways.

15          That's exactly what the Ninth Circuit held in

16   Roommates.  There were further decisions that just because

17   someone can misuse a website feature or functionality or an

18   app feature or functionality doesn't mean the CDA applies.

19   The question for the content neutral test is can it be used

20   in both proper and improper ways?  If anything, the

21   allegations in the complaint confirm that it can be used in

22   numerous safe and proper ways, which do not lead to any harm.

23   So, if anything, on that question, we think that the

24   allegations actually confirm it.

25          With respect to there are allegations which attempt

```
 1    to bolster the case on encouragement; that somehow the filter
 2    itself was encouraged.  If you look at what those allegations
 3    state, one, they're mostly largely conclusory in nature.
 4    Just quoting from articles in which people say that which is
 5    no different from saying it in the complaint.  Second, the
 6    plaintiffs put in this allegation, which is similar to an
 7    argument they made on the last briefing on the motion
 8    to dismiss.  It was in their opposition that the way people
 9    are encouraged is because -- not because Snap actually
10    encourages people to speed.  In fact, Snap has expressed
11    warnings when you open the filter, don't use this while
12    driving.  The allegation is people might think incorrectly
13    that they will be rewarded somehow for speeding.
14          Plaintiffs acknowledge that is not actually how the
15    filter functions.  If you look at paragraphs 31 and 40 of the
16    complaint, they acknowledge that Snap does not encourage in
17    any express way or reward people for speeding.  They say
18    people might have that mistaken belief just generally given
19    how Snap operates.  We would submit, Your Honor, that --
20          THE COURT:  Which it's not germane here.  State the
21    obvious, therefore, provides a means of distinguishing from
22    the California case.  I mean, the radio case.
23          MR. BLAVIN:  Weirum, right, W-E-I-R-U-M.  In that
24    case, the DJ, was telling people I am in this location.  The
25    first party that gets here gets a reward prize, et cetera.
```

And the Court of Appeal there, again, it was actually

analyzing the question of duty not causation.  But what the

Court of Appeal said in that circumstance, you're essentially

creating a competitive game on the streets of Los Angeles

which could lead to harm.  There's no comparable allegation

in the complaint here with respect to that.  Frankly, they

haven't identified any single case which has adopted this

sort of nebulous theory of implicit encouragement.

THE COURT:  Well, now we're getting into the

negligence.  Is there anything else you want to say to me

about the statute, Counsel?

MR. BLAVIN:  Well, just -- and this sort of goes to

the last question Your Honor posed on, you know, what are the

allegations that the ecosystem can sort of encourage people

to engage in this activity.  On that point, again, we would

say there's actually no factual allegations which are

plausible and sufficiently pled to satisfy that.

We would also note, Your Honor, that numerous CDA

cases have held that even if the website could be alleged to

encourage certain type of unlawful content, that's not the

actually the test under the statute.  The test is whether the

website requires users to post that unlawful content.  So if

you look at the Park La Brea decision from Judge Gee, she

specifically noted that -- this is quoting from her

decision -- in the Ninth Circuit, if the alleged content

provider is not a creator of the challenged content, it must

have done more than merely encouraged the creation of the

challenged conduct, the alleged provider must have required

another to create that content.

That comes from the Roommates decision.  You'll

recall there, the Ninth Circuit was struggling with the

question of a website which effectively required users to put

unlawful criteria into their online rental listings --

THE COURT:  Dropdown boxes.

MR. BLAVIN:  The dropdown.  What the Court said is

it's not simply a choice, but it's requiring them to list

unlawful criteria.  In that circumstance, the CDA would not

apply.  It's leaving the user no option but to engage in

illegal activity.

So here, even if Your Honor was to credit these

allegations of encouragement, which we don't think you should

because we don't think they're sufficiently pled, that's not

actually the test under the CDA.  Numerous other Courts have

held that as well.  Besides the Roommates decision, the Jones

versus Dirty World Entertainment Recordings case cited in our

papers from the Sixth Circuit in 2014, the Court explicitly

rejected, quote, an encouragement test of immunity under the

CDA.

So we don't even think if they had pled

encouragement, that would evade CDA immunity in this Case.

```
 1            THE COURT:  Thank you.  Let me hear from the
 2    plaintiffs.
 3            MR. RAMAHANDRAPPA:  Good morning, Your Honor.
 4            THE COURT:  Good morning.
 5            MR. RAMAHANDRAPPA:  Let me start with the bottom of
 6    page 1 of the tentative.  Your Honor states that the Court
 7    cannot simply presume that the speed filter is content
 8    because plaintiffs allege it is.  Then on the next page it
 9    continues, the Court must determine whether the speed filter
10    is content-neutral content or content in and of itself.
11            I guess I would disagree.  I want to start there,
12    which is that the question is whether our claims are based on
13    Snap's content or whether they're based on user's content.
14    So there's no question that the speed filter is content.  The
15    cases that Snap has cited, those are cases where a defendant
16    is being held liable for someone else's conduct -- content,
17    the user's content.  The question is, did the defendant do
18    something to materially contribute to that?  That's the test
19    that those cases travel under.  That's not what we're
20    traveling under.  We're saying Snap's content itself, the
21    speed filter, created by them, not by any users.  That is our
22    claim.
23            The question that you're presented with is, is that
24    the truth?  Is that actually what our claim is, or is it
25    indirectly based on conduct?  That's what Dyroff is
```

1    addressing and a lot of these other cases.  So, for example,

2    Dyroff says -- this is a case where the plaintiff died of a

3    heroin overdose.  The Court says, Experience Project did not

4    create or develop the post that led to Greer's death, rather

5    it was Greer himself who posted, where can I score heroin in

6    Jacksonville, Florida?  Then the dealer responded to that.

7            Those are those cases.  There's an Isis case.  That

8    is -- versus Twitter.  All of the Backpage cases.  All those

9    depended on what someone says in the post.  Here, we don't --

10   our claim does not depend on what is said in the post.  It's

11   the driving that is encouraged by the speed filter.  The only

12   content that you have at issue is the speed filter, and then

13   the tortious act that it encourages is driving.

14           So I thought of a hypothetical that I think might

15   help.  There are these cases some of which we cited in our

16   response brief about data theft.  There's a case where it was

17   alleged that Apple's IOS guidelines encouraged data theft.

18   The Court said, CDA does not apply.  It's about Apple's

19   conduct.  If Snapchat had sent a message to its user saying

20   go steal Instagram's data guidelines, and someone said, I

21   have stolen it, and posted a message that says, here's the

22   code, the CDA wouldn't give immunity for that.  It's not

23   because there's a post somewhere in the ecosystem that it

24   somehow immunizes that.

25           We have that here.  The claim is not about the fact

1    that the -- it wasn't even the driver.  The passenger posted.

2    It's the driving.  The post is just the evidence, the

3    culmination of what happened.  It's the driving that

4    happened.  That's why in the Georgia case, for example, it

5    didn't matter whether the person posted or not, because it

6    was the driving that ultimately caused it.  So that's where

7    the analysis is.

8            So you look to does the claim itself depend on the

9    user's content?  It does not.  It doesn't matter what the

10   user does.  It's the driving that matters.  This

11   distinction -- the reason I'm sort of focusing on, you know,

12   whether our claim depends on user content, it really is drawn

13   out in the Fair Housing case, which is an en banc opinion

14   from the Ninth Circuit.  Opposing counsel is correct that

15   there was this consideration of the dropdown boxes.  There's

16   also consideration of a blank box that just said, put in

17   information.  Those -- that is the second and third claims at

18   issue in the case.  The second claim was the dropdown box.

19   The third claim was the sort of general box.  The first claim

20   was the claim that Roommates' question themselves violated

21   Fair Housing Act law.  I quoted -- wrote down some quotes

22   from that case.  Roommates violates state and federal law by

23   merely posing the questions.  We do not need to decide

24   whether any of Roommates' questions actually violate the law.

25   There was a later Ninth Circuit opinion that said on the

1    merits it doesn't.  But the mere -- on the question of

2    immunity, the Court said, just posing the question -- if

3    that's the plaintiff's claims, it is just the posing of the

4    question that violates the law, then we're not depending on

5    any user conduct.  We don't have to ask this question of

6    whether it is content neutral or whether it encourages or

7    contributes to the illegality.

8            What we have here is the claim based solely on the

9    speed filter.  You know that because the driver wasn't even

10   using Snapchat.  While the passenger was using it, it is not

11   the post.  No one was harmed by the post.  The post didn't

12   lead someone -- it is not like one of the kids in the car

13   sent a message to the driver said, hey, go really fast.

14   That's not what we're saying.  It's the speed filter itself

15   that encourages that.

16           I do want to address the second part of that.  The

17   way I've outlined it is, if the claim depends on the

18   Snapchat's content, then you don't look at any of those

19   factors.  If you disagree with us on that, the alternative is

20   okay, well, does it materially contribute --

21           THE COURT:  I will keep in mind this is the

22   alternative.

23           MR. RAMAHANDRAPPA:  On that point, I guess I would

24   make two main arguments.  Number one, as Your Honor saw in

25   your own questions in response by opposing counsel, that gets

```
 1    into the factual merits of case.  So, for example, their

 2    arguments about whether rewards encourage people to engage in

 3    speeding.  Those questions, to the extent -- once you start

 4    to get into that, you realize that is a question that needs

 5    to get fleshed out in discovery and possibly dealt with in

 6    summary judgment or trial.  I understand the immunity is a

 7    legal question.  If there are factual questions that underlie

 8    it, then you need the evidence in order to decide that.

 9    That's number one.

10          Number two, the simplest way of saying that

11    Snapchat materially contributed to this is you can't -- they

12    developed the speed filter.  It's not like this was some, you

13    know, invention of one of the users.  They made the speed

14    filter.  So these questions I think sort of illustrate some

15    of the arguments to say -- sorry.  What is plaintiff's best

16    argument that speed filter is not content neutral, but

17    content that materially contributes in developing the alleged

18    legality -- illegal --

19          THE REPORTER:  I'm sorry, Counsel --

20          MR. RAMAHANDRAPPA:  Alleged illegality.

21          So the -- the question is Snapchat has the speed

22    filter.  The illegality is driving fast.  It's driving over a

23    hundred miles per hour.  It's not the post.  So our claim is

24    that it does encourage it.  When people see the speed filter,

25    especially over these many years where these incidents have
```

1    occurred, that's what is contributing to it.  It has nothing

2    to do with the particular post.

3         Now, it can be used, as opposing counsel said, in,

4    you know, in innocent ways.  You can use it on a bike, in a

5    plane, while walking.  That's all true, but the reality is

6    that the people are just not using it for those purposes.

7    What is being used and what people have a direct connection

8    to is driving over a hundred miles per hour.

9         I'll end with this point.  I posed an article on

10   the CDA issue.  Opposing counsel said, you know, we're just

11   quoting newspaper articles.  We are.  Some of those newspaper

12   articles are quoting college students.  They are quoting

13   users of Snapchat who say things like, for example, when you

14   get in the car, you want to go as fast as you can.  If you're

15   thinking about okay, well, do I need to decide whether it

16   materially contributes to the illegality, the only way to do

17   that is to look at the facts.  Our allegations are they

18   are -- that, in fact, people are encouraged by the speed

19   filter to drive at over a hundred miles per hour.  That is a

20   factual question that needs to be born out by the evidence.

21        THE COURT:  Thank you.

22        Very brief response on the statute.  You may move

23   to your argument on the negligence.

24        MR. BLAVIN:  Thank you, Your Honor.  So with

25   respect to the argument that this in and of itself is

1    content, that's precisely what the Courts have rejected.

2    They said when you have a functionality of the website, such

3    as an algorithm which converts third-party content and

4    displays it in a different way, the algorithm -- the

5    functionality isn't in and of itself content.  It is a tool,

6    just as in Dyroff that allows users to facilitate

7    communications.

8            So if you look, Your Honor, for example, at the

9    Marshall Locksmith case -- this is again from the D.C.

10   Circuit cited on page 22 of our motion -- the Court there

11   specifically held, quote, the translation of third-party

12   information into map pinpoints does not convert the

13   defendants into information-content providers because they

14   use a neutral algorithm to make that translation.

15           What these Courts, the Herrick case from the Second

16   Circuit, what they're all saying is, you look at what the

17   tool is.  If the tool is a way that allows users to take

18   information, post it, and share it with others, it is not

19   content in and it of itself.  It is a neutral tool that

20   allows users to convey their information.  There is no

21   dispute here that the information that is conveyed is

22   someone's speed.  No different than their location on the

23   street.  No different than the address of their establishment

24   in these cases.

25           So simply the fact that it has functionality, that

1    it is an algorithm built with code does not make it content.

2    It is a tool that allows users to facilitate and share

3    information with one another.  It, therefore, cannot be

4    considered content under the Dyroff decision.

5            Now, he had certain hypotheticals.  What if Snap

6    said, hey, engage in this activity?  Well, listen, if Snap,

7    when you open the filter, said on the top of it, try to get

8    up to a hundred miles an hour, you know, you'll get a reward.

9    That information, that content would have been written by

10   Snap, and we would submit, Your Honor, there would be no CDA

11   immunity for that information.  That is information that Snap

12   created.  That is different than what they're alleging here.

13           That's like in the Apple IOS case, the operating

14   case that they cited, the allegation there was that Apple's

15   technical guidelines were explicitly encouraging third

16   parties to engage in data theft.  What the Court there said

17   is that is Apple's content.  It said those words.  That is

18   different than the facts here.  There is no allegation that

19   Snap said anything to users encouraging them to engage in

20   illegal activity to speed.  In fact, the allegations

21   demonstrate the opposite.  Snap warns users not to engage in

22   that activity when they open the filter.

23           THE COURT:  Thank you.  If you would turn to the

24   negligence issues, please.

25           MR. BLAVIN:  On that, Your Honor, I would ask, you

```
1    want to start with the plaintiffs because the question was
2    posed to them, or would you like to start with defendants?
3              THE COURT:  I guess, you're the moving party.  So
4    if you can sort of answer the question by reviewing with me
5    the arguments you're making.  Like I said, I don't feel you
6    need to address the choice of law.  If you feel strongly on
7    it, you can go ahead.
8              MR. BLAVIN:  No problem.
9              We would agree, Your Honor, that there is no
10   difference in the substantive law on the question of
11   proximate causation between Wisconsin and California.  We
12   said that in our papers.  So we don't think we need to
13   revisit those questions.
14             With respect to the allegations of causation in the
15   Court's prior order on the motion to dismiss the Court
16   identified, the critical issue is the complaint needs to
17   actually demonstrate that Snap -- this is to use Your Honor's
18   words -- actually encouraged the activity at issue here.  We
19   don't believe that the complaint's new allegations meet that
20   burden.  There is no allegation, as noted before, that there
21   is anything new with respect to the functionality of the
22   filter itself.  No discovery from Snap would be relevant to
23   that question.  The filter, obviously, publicly accessible.
24   Anyone can use the app to figure out how it works.  They have
25   had at this point two complaints to allege anything they can
```

1   with respect to the functionality of the filter.  The

2   allegations remain the same, which is it is simply a tool

3   which is neutral in application which reflects someone's

4   speed.

5          So there is no new allegation regarding Snap

6   actually encouraging one to engage in illegal activity.  In

7   fact, their only allegation relates to this theory of

8   implicit encouragement.  The authorities that they rely upon,

9   and we touched on this briefly before, are explicit

10  encouragement cases.  The Weirum case, which we discussed

11  previously.  They now cite a case called Keeley Ice Cream

12  from Utah, a 1925 decision.  Even if Your Honor was going to

13  credit that case -- that case involved someone throwing candy

14  in a parade to children, and the children were running to get

15  the candy.  I mean, there's no allegation here that Snap is

16  creating a race between people to get something that could

17  result in a reward or prize.  Nothing like that exists in the

18  complaint.

19         If you look at the Courts which have dealt with

20  similar allegations -- this is the Coalition Against

21  Distracted Driving case, the Modisette case from the

22  California Court of Appeal, which Your Honor referenced

23  before, the Meador versus Apple case from the Fifth Circuit.

24  All of these cases dealt with similar allegations that the

25  functionality of, for example, in Modisette, the Apple

1    iPhone's FaceTime app, that young people in particular love

2    doing FaceTime; that there is almost an addictiveness to it,

3    a compulsiveness.  They want to engage in this activity

4    including while driving with their friends.  What the Court

5    of Appeal said there that doesn't create the kind of

6    allegations which would show that Apple should be deemed the

7    proximate cause of that accident.

8         The Meador case, against Apple from the Fifth

9    Circuit interpreting Texas law on this question said, you

10   know, the allegations that users have a compulsion to engage

11   in texting -- there, the issue was texting, including while

12   driving, doesn't mean that Apple should be deemed the

13   proximate cause of the accident.  One thing that the Fifth

14   Circuit noted, which I think is important for Your Honor,

15   because last time at the hearing you said, you know, I'm a

16   Federal District Court Judge in California.  I can't certify

17   this issue to the Wisconsin Supreme Court, for example, or

18   the California Supreme Court, at least at this stage.

19        And one thing that is important is that in Meador,

20   the Fifth Circuit noted the same thing.  We're a court

21   sitting in diversity here trying to interpret Texas law.

22   What the plaintiffs are arguing is there is no authority to

23   support exactly what their claim is that we should

24   essentially expand Texas law to encompass this type of

25   activity.  The Fifth Circuit noted under Erie, it's improper

1    for federal courts to do that.  In the absence of some clear

2    authority supporting the claim under state law, it's not for

3    a federal court sitting in diversity to take that extra step.

4         We would submit, Your Honor, there is absolutely no

5    authority, no case cited by the plaintiff which would support

6    this claim in this instance which would show causation.  If

7    anything, all of the authorities reject that implicit theory

8    of encouragement, and the only authorities which support any

9    sort of encouragement theory are expressed encouragement

10   cases.

11        That's why the Court in Maynard, noted that

12   distinction between the two bodies of law and said, you

13   haven't alleged express encouragement here.  At most, you've

14   alleged some sort of implicit theory of encouragement.

15   That's not sufficient.

16        Again, even if Your Honor were to recognize an

17   implicit theory of encouragement, and say, you know, maybe

18   there's some basis of law for that, you actually look at

19   allegations which --

20        THE COURT:  More likely on 12(b)(6) say, I'm not

21   willing to go there in the absences of cases telling me I

22   should.

23        MR. BLAVIN:  Understood, Your Honor.  Even if you

24   were, I would say it's too vague.  Your Honor recognized that

25   in the Court's prior order that the allegations that people

 1    might have a subjective belief, which is untrue, that they

 2    could get a reward is not enough to support an implicit

 3    encouragement theory, particularly one we warn people not to

 4    engage in this activity.

 5            This is not something that discovery would show.

 6    It's something that is publicly available now.  If there was

 7    a basis for the allegation, they could allege it.  There

 8    simply isn't because it's not true.

 9            THE COURT:  Thank you.

10            Let me hear from the plaintiffs.  In addition to

11    the questions I have here, again, you don't feel you have to

12    answer -- approach this in exactly the same way, although you

13    are certainly free to.  Also, then what difference do the

14    plaintiffs believe that the new complaint is making here?  If

15    you want to say, well, we thought it was fine last time.  We

16    changed some words to humor you, you can feel free to say

17    that.  In the belief that you feel you did a bit more than

18    that, what is it that you think you've done in this

19    complaint?

20            MR. RAMAHANDRAPPA:  Sure, Your Honor.  If it's all

21    right, I'll come to that at the end.

22            THE COURT:  You may.

23            MR. RAMAHANDRAPPA:  I want to start where opposing

24    counsel began his rebuttal, which is that if Snap had said

25    the words, get up to 100 miles per hour, they agree that

```
 1    wouldn't be covered by the CDA.  The reason I want to start
 2    there is because I think that summarizes what we're arguing,
 3    both in terms of the CDA and on the negligence.
 4         It is true Snap does not tell people explicitly go
 5    a hundred miles per hour.  That is the exact message that
 6    Snap users are receiving.  That's what they're hearing.  So
 7    the question is, is there a law that says that you have to
 8    explicitly say something or whether it can be implicitly
 9    encouraged.  Our position is it can be implicitly encouraged.
10    I take issue with opposing counsel's characterization of the
11    Shafer versus Keeley case.  It's a Utah Supreme Court case.
12         In Snap's brief they say, quote, a party explicitly
13    encouraged young boys to rush through a crowd.  There is no
14    explicit encouragement in that case.  I encourage you to look
15    at facts of that case closely.  It does not say that.  The
16    Shafer case is important because it is one of the cases upon
17    which the second restatement Section 303 is based on.  That
18    also not only does it not use the words explicit
19    encouragement, it doesn't use the words encouragement at all.
20    It says, an act is negligent if the actor intends it to
21    affect or realizes or should realize that it is likely to
22    affect the conduct of another.
23         So that is the standard.  Not encouragement, not
24    explicit encouragement, but realizes or should realize.  Same
25    is true for Weirum case.  The Weirum case cites Shafer
```

1    itself.  In the Weirum case, there was no explicit

2    encouragement to speed, to break the law.  In fact, the Court

3    of Appeal's opinion in that case, which was obviously

4    reversed, said that there is no evidence that KHJ's car was

5    violating any law, thus suggesting or requiring that teenage

6    drivers also violated.

7           So there was simply no explicit requirement in

8    that.  All these cases confirm that it's where an actor

9    realizes that their conduct is encouraging this behavior, not

10   because they intended it, not because they explicitly said

11   it, because, in fact, it was occurring.

12          Now, an additional point I want to address from

13   opposing counsel in Snap's brief is they say that okay, all

14   these cases they only deal with duty.  Restatement only deals

15   with duty.  It is also not true.  We have a long quotation

16   from Shafer in our brief.  Again, if you read the case, the

17   case said, quote, the question of what is or not is proximate

18   cause of the injury is for the jury.  It even has this

19   tradition of some Courts where it says it would -- they say

20   it's -- it wouldn't do any good to list all of the

21   definitions of proximate cause.  Then they proceed to list

22   about five different definitions.

23          So that just shows you how much they're talking

24   about proximate cause.  Again, Weirum says Shafer is not

25   distinguishable.  In the present case, as we've seen, the

1    jury's determination that accident was foreseeable is

2    supported by the evidence.

3           Again, or related to that point, foreseeability

4    does matter.  Snapchat has said while foreseeability is

5    separate.  It doesn't deal with causation.  It only deals

6    with duty.  That's not what those cases say.  Those cases say

7    that is a way of lessening the requirement on the plaintiffs.

8    Especially when it comes to intervening cause, which is the

9    argument that they're making, foreseeability certainly

10   matters.  That's what all of these cases say.

11          One last point about the law.  Then I want to turn

12   to some of the specific allegations in the complaint, there

13   is also this argument that the restatement section we've

14   cited only deals with duty.  That is true, but the

15   restatement section that deals with causation is the same.

16   This is Section 449 of the second restatement.  The

17   likelihood that a third person may act in a particular manner

18   is a hazard or one of the hazards which makes the actor

19   negligent, such an act, whether innocent, negligent,

20   intentionally tortious, or criminal does not prevent the

21   actor from being liable.

22          That same language is quoted in Weirum.  It's

23   quoted even in one of the Wisconsin cases that they cite.

24   Stewart versus Wulf.  Stewart versus Wulf is another case

25   that I think is really important on this question, which

```
1    comes from their briefs.  That's a case where a person left a
2    loaded handgun in a room, and his friend came in and picked
3    up the gun.  It went off.  The Wisconsin Court said, well,
4    they were both negligent, but that is a question for the jury
5    to decide as to who is more negligent and whether it reaches
6    the bar.  That's another proof of it matters whether it was
7    foreseeable.  It matters that there is no question about
8    explicit encouragement.  It's a question of did you realize
9    it.
10              Now, turning to the specific allegations in the
11   complaint and whether anything has changed from the prior
12   order.  I want to say two things to that.  Number one, we
13   have alleged the time frame --
14              THE COURT:  Right.
15              MR. RAMAHANDRAPPA:  More explicitly.
16              Number two is -- you know, to be honest some of
17   these were in our brief.  It's a question of whether you
18   counted the arguments made in the brief as in the complaint.
19   In particular --
20              THE COURT:  Well, I was unwilling to do that last
21   time.  It would affect whether I gave you leave to amend or
22   not.
23              MR. RAMAHANDRAPPA:  Certainly.  With regard to --
24   so those quotations that were in the brief are now in the
25   complaint.  In the complaint, those allegations, the -- the
```

```
 1    importance of those is not just that some person had said oh,
 2    for example, does Snapchat speed filter encourage dangerous
 3    speeding.  It says -- it's that those are statements from
 4    people actually using Snapchat.  They are from college-age
 5    students.  They are from a mother who lost her daughter and
 6    said hey, that's horrible that there is something out there
 7    to tell them go faster.  Those things matter for a 12(b)(6)
 8    standard.  The standard is plausibility.  Is it plausible?
 9    Not whether you agree with it.  You know, we're all familiar
10    with the language.  It can be extravagantly fanciful.  It can
11    be unlikely as almost anything.  Is it plausible?
12           We know it's plausible because that is what people
13    in real life who are using this app explain it.  Your Honor's
14    order said actually encouraged, not explicitly encouraged.
15    The word actually means in fact.  We have alleged in fact
16    that people -- that is a motivating effect that they have.  I
17    don't really think Snapchat can disagree with those
18    allegations.  Their disagreement is about whether that
19    measures up to the standard.  Whether they have to
20    actually -- explicitly tell someone to go a hundred miles per
21    hour.  That's where the real disagreement lies.
22           Two final points that are illegal in nature.  The
23    Maynard Georgia case.  As we stated in our briefs, that was
24    an order drafted entirely by Snap's counsel.  The idea that
25    it is similar authority.  It is true, the Court did sign on
```

1     to that order.  They're citing their own brief.  In Georgia

2     and federal law, there's always doubt cast when it is written

3     by the parties themselves and the Court signs off.  Even

4     during the hearing, the judge didn't him questions.  There's

5     no indication other than he signed it.

6            I would say that why shouldn't the Court reach the

7     same conclusion, because we're still arguing over the same

8     issues.  Related point to that, opposing counsel raised the

9     point about Erie and these -- some of these cases that deal

10    with cellphones generally.  I would say about Erie, the

11    Court's obligation obviously is to address the facts before,

12    and the standard is not be cautious.  The standard is predict

13    how the Supreme Court or the Court of last resort in these

14    jurisdictions would decide the question.  Courts have to deal

15    with changing circumstances.  We can't forever be stuck in

16    the law that was developed in the past, but even if we

17    were -- even if we were looking at the law in the past, the

18    Shafer case, which is, you know, a quite well-established

19    case, and the Weirum case, they all show that you're not

20    required to have explicit encouragement.

21            I guess I said I have one or two more points.  I do

22    have a final point, which is I need to address the Modisette

23    case and the Apple cases.  I think the easiest way to do this

24    is to read from the Modisette case specifically.  This is

25    what the Court described their claims as:  Essentially, the

1    Modisette argues that cellphone manufacturers owe a duty to

2    all individuals injured by drivers who are districted by

3    using the phones while driving.  That's a very broad claim.

4         In fact, the Coalition Against Distracted Driving

5    case, the plaintiffs sought a permanent injunction requiring

6    defendants to fund a $1 billion national public education

7    campaign.  Those are not -- those are not our claims.  We're

8    not arguing that no one should be able to use a mobile phone

9    while driving or even as a passenger.  We're not saying that

10   they can't use Snapchat.  We're arguing about Snapchat's

11   specific speed filter app with regard to young adults,

12   teenagers, college-age students, and in light of the specific

13   knowledge they've had.  That makes this case vastly

14   different.

15        What all those cell phone cases are deciding is

16   they are saying as a matter of public policy, we can't ban

17   cell phones.  They are too ubiquitous, too important.  They

18   have all of these different functions.  We use them for all

19   sorts of things, like emergency calls.  That's not what we're

20   talking about here.  We're not even saying you can't use

21   Snapchat.  We are saying, this speed filter, turn it off.

22   What's the benefit.  That is risk utility analysis.  That is

23   classic products liability law.  That is the classic things

24   that go to jury.  There are certain extreme cases.  For

25   example, personally speaking, I don't own a car.  I ride a

1   bicycle.  I can go an anti-car rant for sure.  I would be

2   thrown out of court if I said cars are inherently dangerous.

3   That doesn't mean we reject claims about specific features of

4   cars.  If you had a car that lets you go a thousand miles per

5   hour, I'm sure there would be a lawsuit about that.  Even

6   various things.  Seat belts, car without a seat belt, air

7   bags.  That is what we're talking about a specific feature

8   that serves virtually no purpose.

9            You know, to the extent that the question of choice

10  of law matters, I would say certainly Wisconsin laws makes it

11  clear that these public policy questions, while they are

12  decided by Courts, they should be decided in some cases after

13  trial, because they involve so much of the factual elements

14  that the Court should have that before it makes a decision on

15  something like public policy when foreseeability is a big

16  part of that.

17            THE COURT:  Thank you.

18            Very briefly from Snap.

19            MR. BLAVIN:  Quickly on the Modisette case, Your

20  Honor, the claim in that case was Apple should disable with a

21  lock-out feature the FaceTime feature functionality while

22  driving.  So the claim was not, you know, no iPhones allowed

23  at all.  It was actually fairly tailored similar to the

24  allegations here that this specific feature FaceTime while

25  driving, there should be a lock-out feature.  It won't work

```
 1   when someone is in a vehicle, which Apple would know.  It was
 2   pretty narrowly tailored.  The Court said Apple should not be
 3   deemed the proximate cause of that accident.
 4         That's similar to the Meador case, the Riggs case,
 5   the Coalition Against Distracted Driving cases, all of these
 6   cases were dealt with the on the pleadings at the demur
 7   stage, at the motion to dismiss stage.  There was no further
 8   discovery.  The Court said simply as a matter of law, they
 9   have not sufficiently pled proximate cause.
10         With respect to the allegations regarding
11   foreseeability, in our reply brief and opening brief, Your
12   Honor, we cited half a dozen or more cases noting that
13   foreseeability is distinct from causation.  It has no place
14   in the causation analysis.  It may be relevant to duty.  In
15   fact, in the Modisette case, the Court of Appeal noted that
16   it very well may be foreseeable for Apple that people are
17   going to misuse the FaceTime feature while driving.
18   Nonetheless, that wasn't sufficient to show causation,
19   because they are distinct inquiries.  This is black letter
20   law.
21         The cases they're relying upon deal with the
22   question of duty, negligence generally.  What the Courts have
23   held is you could have a duty.  It may have been foreseeable.
24   It may have even been negligent on your behalf, but the
25   question is does that duty, does that negligence actually
```

1    cause the injury alleged?  In these cases that we've relied

2    upon, the Courts have said no, it doesn't allege it.  That is

3    insufficient.

4            Unless Your Honor has any further questions, we

5    would submit.

6            THE COURT:  Thank you, Counsel.  Obviously, I am

7    taking the matter under submission.  I assure you that I will

8    read your briefs closely before I issue my final decision.

9    Thank you.

10           (Proceedings concluded at 11:05 a.m.)

11                          CERTIFICATE

12   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

13   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

14   THE ABOVE MATTER.

15   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

16   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

17   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18

19   /s/ Miriam V. Baird            03/04/2020

20   MIRIAM V. BAIRD                      DATE
     OFFICIAL REPORTER
21

22

23

24

25